UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No. 4:05CR544 CAS (AGF) |
| MARVIN FORD, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Marvin Ford. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress statements and evidence and to disclose the identity of a confidential informant. (Doc. #15). An evidentiary hearing was held on December 22, 2005. The government was represented by Assistant United States Attorney Michael A. Reilly. Defendant was present and represented by his attorney, Assistant Federal Public Defender Felicia A. Jones. At the hearing, the government presented the testimony of Officer Bradley Owens, who has been employed with the St. Louis Metropolitan Police Department (SLMPD) for almost four years. The witness was cross-examined extensively by defense counsel. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and

conclusions of law.

## FINDINGS OF FACT

On April 22, 2005, Officer Bradly Owens obtained a state search warrant for the apartment at 4917A Dr. Martin Luther King (the "Residence"), in the City of St. Louis. Govt. Ex. 1. Officer Owens, who is currently assigned to the Mobile Reserve unit, was a member of the Eighth District Weed & Seed unit at the time of these events, a unit to which he had been assigned for approximately 2½ years. Weed & Seed is a program which targets designated high crime areas and attempts to rid the area of drug and other crime and then improve the area through development programs. Prior to April 22, 2005, Officer Owens had participated in approximately 200 narcotics-related arrests and had received specialized training in narcotics investigations and interdiction.

The affidavit in support of the search warrant states that on April 19, 2005, Officer Owens was contacted by a reliable confidential source (the "CS") who he had known for the past 10 months. The CS had proven reliable in the past and had provided narcotics-related information on nine separate occasions, which had led to the seizure of crack cocaine and heroin, and the arrest of nine subjects whose cases were then pending in the St. Louis Circuit Court. The CS advised that an individual known to the CS only as "Marvin" was selling crack cocaine from the 2nd floor apartment at 4917 A Dr. Martin Luther King. He described Marvin as a black male in his late forties, approximately 5'9" in height, weighing 230 pounds and with very short hair.

As the affidavit further recites, the CS stated that he had recently been inside the Residence and observed Marvin to be in possession of a baseball-size piece of crack cocaine, which he was cutting into smaller pieces, weighing on an electronic scale, and packaging in baggies for distribution. The CS observed Marvin hide portions of the packaged crack in various locations in the apartment. While in the Residence, the CS had observed Marvin sell crack cocaine to various individuals who came into the apartment for the sole purpose of purchasing crack cocaine. The purchasers would knock on the front door, and Marvin would either complete the transaction in the doorway, or invite the individuals inside. After the transaction was completed, the purchasers would immediately leave.

The affidavit in support of the search warrant further recites that based on this information, a check of the police department's I-Leads system was conducted to further identify "Marvin." The system identified a black male named Marvin Ford, with a date of birth of May 2, 1957, and an identified social security number, linked to the Residence. The individual had a prior criminal record and was then listed as on probation for federal cocaine charges. A photograph of the subject, Marvin Ford, was obtained from the Department of Revenue files and shown to the CS, who positively identified him as the individual named "Marvin" he had observed selling crack cocaine from the Residence.

Based on this information, Officer Owens and others conducted a series of three surveillances of the Residence, using binoculars, each lasting between 25-55 minutes.

The first was during the evening hours of April 19, the second was during the early afternoon of April 20, and the third was during the early evening of April 21, 2005. The affidavit recites that during each surveillance, Officer Owens observed a heavy amount of vehicle and pedestrian traffic at the Residence. The individuals would knock on the door of the Residence and most would be permitted inside, and a few minutes later they would exit the Residence and leave the area. Those not permitted inside conducted what appeared to be hand-to-hand transactions with an individual who Officer Owens recognized as Marvin Ford from the previously-obtained photograph.

Finally, the affidavit recites that after the last surveillance on April 21, 2005, the CS came to the station and advised Officer Owens that he/she had left the Residence within the past three hours, and that "Marvin" had just received another large portion of crack cocaine and was packaging it into smaller quantities for distribution, stating that he was planning on having "a great weekend of dope slinging."

Based on this information, Officer Owens applied for and received a search warrant for the Residence. The application was approved by an Assistant Circuit Attorney, and was sworn to before a Circuit Judge and issued on April 22, 2005, at 11:45 a.m. Officer Owens believed the information contained in the affidavit was true and correct at the time he executed the warrant, and continued to believe the information was true and accurate. The search warrant authorized a search of the Residence for "Crack cocaine, or any other Illegal Narcotic, U.S. Currency, weapons, Drug Transaction Records, and any other instruments of the crime." Govt. Ex. 1.

A team of officers, including Officer Owens, his supervisor, Sgt. Michael Marks, Officers Darnell Walters and Matthew Mayer, and others, was assembled to execute the warrant on the evening of April 22, 2005. Prior to executing the warrant, the officers discussed the manner of entry, about which they had several concerns. The Residence had a white iron outside door as well as an interior door, and the officers determined that a forced entry would be difficult due to the nature and configuration of the doors. Govt. Ex. 3. In addition, the apartment itself was located on the second floor, which would further delay the actual entry, thereby permitting the subject to destroy contraband or arm himself. Officer Owens knew from his training and his own experience that most individuals engaged in the sale of narcotics had firearms. Because of concerns of officer safety, and to minimize both property damage and the risk that any contraband would be destroyed by any delayed entry, the officers decided to attempt to make a soft entry involving a ruse accident to draw the subject outside.

The officers had information that Defendant Ford used a white minivan that was then parked in front of the Residence. At approximately 9:45 p.m., on April 22, 2005, Officer Walters, who was dressed in plain clothes, staged a ruse accident involving the white minivan. He pulled his undercover car near the white minivan, activated his emergency flashers, and honked the car's horn. He then knocked on all three doors of the building. Sgt. Marks and Officers Owens and Mayer, who were all in uniform, were in unmarked cars conducting surveillance as this transpired. Three other uniformed officers were also present, on stand-by. The CS was not present at the time the officers executed

the warrant.

Defendant Ford eventually responded to the knock on his door and came out to the sidewalk with Officer Walters to examine the damage to his minivan. Officer Walters observed what he believed to be a "blunt" over Defendant's right ear. The officers were familiar with "blunts," which are cigars in which the tobacco is removed and marijuana is inserted in its place. The other officers approached and Officer Walters advised Officer Owens of the blunt. Officer Owens, who recognized the blunt as an illegal controlled substance, placed Defendant under arrest for the possession of marijuana and put him in handcuffs. He advised Defendant of his rights under <u>Miranda</u> by reading the rights to Defendant from a card that he keeps with him. Officer Owens read those right into the record as he had read them to Defendant at the time of his arrest. Defendant said he understood his rights, and said something like, "Come on. I can't fucking believe this." At the time of his arrest, Defendant did not appear to be under the influence of drugs or narcotics, and appeared to understand what was being said. No threats or promises were made to Defendant to induce him to make any statements, and no questions were asked of him at that time.

The officers advised Defendant that they had a search warrant. Officer Owens then searched Defendant incident to his arrest, and located what appeared to be some crack cocaine in Defendant's front pant pocket. He thereafter advised Defendant that he was also under arrest for the possession of crack cocaine, to which Defendant stated, "I'm fucked." Laboratory results later confirmed that the blunt contained .49 grams of

marijuana, and that the item taken from Defendant's pant pocket was .07 grams of cocaine base.

The officers asked Defendant if anyone else was in the apartment, and he said that his girlfriend, Ina Betts was in the Residence. At the time, the outside iron door to the Residence was partially open and the inside door was open. The officers entered the doorway and yelled "Police. Search warrant." Ms. Betts came to the stairs and put her hands up. As the officers were going up the stairs, Ms. Betts advised the officers, presumably in response to their question, that her four-year-old son also lived in the Residence, but was not then present. Defendant was held outside while the officers conducted a protective sweep of the Residence. Defendant and Ms. Betts were then brought into the front room while the officers conducted the search of the Residence. As Defendant was led into the Residence, he repeatedly stated, "I'm fucked." At some point, Defendant identified the middle bedroom of the Residence as his. Ms. Betts occupied the rear bedroom.

In Defendant's bedroom, the officers located a homemade container, made of foil and duct tape, in between the mattress and boxspring. Inside were three chunks of suspected crack cocaine. On the left side of the dresser, the officers located some mail with Defendant's name and address, and on the right side of the dresser they located a digital scale and an open box of baggies, which they knew were commonly associated with the distribution of narcotics. They also located and seized two plastic bags, wrapped in duct tape. In the front room, taped under the piano bench, the officers found two pill

7

bottles and a plastic bag covered with duct tape. Photographs of the items seized were attached to the search warrant return. Govt. Ex. 1.

Following the search, Defendant was advised that he was being charged with drug trafficking, second degree, and the possession of drug paraphernalia. Approximately 15 minutes had passed from the time of Defendant's initial arrest until the time he was advised of this charge. At or near this time, Defendant stated that he was going back to jail, that his probation officer would see to it. Shortly after he was advised of the upgraded charge, and while still in the Residence, Officer Owens offered Defendant the opportunity to make a written statement, and Defendant declined. Sgt. Marks advised Officer Owens that at some point during the search Defendant stated to Sgt. Marks that he had been released from prison and was trying to get his life back together. Officer Owens did not know exactly when that statement was made.

## CONCLUSIONS OF LAW

Defendant asserts that the search warrant is facially insufficient and does not provide probable cause for the search. He also denies the facts and asserts that the officers did not have probable cause for his arrest and the search of his person based either on the warrant or their observation of Defendant. Defendant expressly acknowledged that he was not making any argument of impropriety related to the ruse accident or the actions taken by the officers to entice Defendant out of the Residence. Defendant further asserts that Defendant's statements should be suppressed as the fruit of the unlawful arrest and search, because he was not properly advised of his Miranda

8

rights, and because his statements were involuntary.  Finally, Defendant requests disclosure of the identity of the CS.

### A. <u>Probable Cause for the Search Warrant</u>

To be valid, search warrants must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched.  <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>Johnson v. United States</u>, 333 U.S. 10 (1948); Rule 41, Federal Rules of Criminal Procedure.  The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions.  "In dealing with probable cause . . . as the very name implies, we deal with probabilities.  These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  <u>Brinegar v. United States</u>, 338 U.S. 160, 176 (1949).  Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules."  <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).  Applications and affidavits should be read with common sense and not in a grudging, hyper-technical fashion.  <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965).  Probable cause may be found in hearsay statements from reliable persons, <u>Gates</u>, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959); or in observations made by trained

9

law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948); United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003), cert. denied, 541 U.S. 1081 (2004). While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive. Information contained in applications and affidavits for search warrants must be examined in light of the totality of the circumstances presented. Gates, 462 U.S. at 230. Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding. Id. at 236.

As set forth in the affidavit, here the officers had received information from a confidential informant who had proved reliable in the past and whose information had led to drug seizures and the arrest of and charges against nine individuals. The officers thereafter corroborated that information through their own surveillance on three separate occasions, during which they observed a large amount of traffic in which individuals entered the Residence for a very brief period of time or engaged in what appeared to be hand-to-hand transactions with Defendant. The CS had also been inside the Residence within a few hours prior to obtaining the warrant and had again observed Defendant breaking down a larger amount of crack cocaine into distribution quantities. The officers also confirmed through their own investigation that an individual named Marvin Ford, who matched the description given by the CS, lived at the Residence, and that Marvin Ford was on probation for a prior cocaine conviction, and the CS identified a picture of Defendant as the "Marvin" he had previously observed.

10

From a review of the affidavit, the Court finds that there is ample probable cause to support the warrant. See United States v. Underwood, 364 F.3d 956, 963 (8th Cir. 2004) (information from reliable informant and corroborated by independent officer investigation sufficient for probable cause), vacated and remanded on *Booker* grounds, 125 S.Ct. 1037 (2005); United States v. Gabrio, 295 F.3d 880, 882 (8th Cir. 2002) (probable cause found based on firsthand information of reliable informant); United States v. Pennington, 287 F.3d 739, 742-43 (8th Cir. 2002). Even if there was some question regarding the probable cause or the degree of detail provided – and there is not – the officers relied, in good faith, on the warrant. United States v. Leon, 468 U.S. 897, 922 (1984); United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001).

### B. Arrest and Search of Defendant

Officers have probable cause to effect a warrantless arrest at the moment when they have knowledge of facts and circumstances, grounded in reasonably trustworthy information, that would warrant a belief by a reasonably prudent person that the subject has been or is committing an offense. United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003). Based on the totality of the information known to the officers at the time, including the information contained in the search warrant affidavit and their observation of Defendant in possession of what appeared to be a marijuana blunt, the officers had probable cause to arrest Defendant without a warrant. See United States v. Velazquez-Rivera, 366 F.3d 661, 664-65 (8th Cir. 2004); United States v. Powell, 39 F.3d 894, 895-96 (8th Cir. 1994); United States v. Sherrill, 27 F.3d 344, 347 (8th Cir. 1994).

Following Defendant's lawful arrest, the officers were authorized to search Defendant incident to his arrest. New York v. Belton, 453 U.S. 454, 457 (1981); United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1999). They were therefore authorized to seize as evidence both the marijuana blunt from above his ear, and the crack cocaine located in his pant pocket.

### C. Statements Made by Defendant

As grounds for the motion to suppress his statements, Defendant asserts that his statements were the fruit of an unlawful search and seizure, and that Defendant was not advised of his rights under Miranda. Defendant's first ground fails for the reasons set forth above. Defendant's second ground fails because the Court finds, as a factual matter, that Defendant was advised of his Miranda rights prior to making any statements. On this record, the Court further finds that Defendant knowingly waived his rights, and that the statements made by him were voluntarily. Only a brief period of time – fifteen to twenty minutes – passed between Defendant's initial arrest and advice of rights, and the last of the several statements made by him. Defendant appeared to understand what was being said, and his statements were not the result of any threats, promises, or coercion. That he declined to make a written statement further confirms Defendant's understanding of his rights and the voluntariness of his oral statements.

Moreover, Miranda warning are required only when a defendant is subjected to interrogation or questioning reasonably calculated to elicit incriminating information. Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Here, none of the statements made

by Defendant were the result of any interrogation. United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (officer's comment that he had tried to arrest the defendant the day before, to which the defendant responded with incriminating statement, was not the functional equivalent of interrogation because it was not likely to elicit incriminating evidence, but rather was a factual statement not accompanied by threats or pressure); United States v. Lockett, 393 F.3d 834, 838 (8th Cir. 2005) (advising the defendant they were looking for him when he asked why the officers were there and explaining what defendant was suspected of are not the functional equivalent of interrogation).

### D. Request for Disclosure of Confidential Informant

Defendant asserts that the government should be compelled to disclose the identity of the confidential informant under Roviaro v. United States, 353 U.S. 53 (1957). In support of his request, Defendant asserts that the CS was instrumental in making the identification of Defendant as the drug dealer with whom the CS had dealt and was the basis for the search warrant.

The government has a privilege to withhold the disclosure of the identity of its informants, under McCray v. Illinois, 386 U.S. 300 (1967) and Roviaro. However, that privilege is not absolute, and disclosure is required where the defendant has met his burden of demonstrating that the informant is a material witness or that his or her testimony is necessary to the defense. Roviaro, 353 U.S. at 60-62; United States v. Harrington, 951 F.2d 876, 877 (8th Cir. 1991).

At the hearing, Defendant presented no information whatsoever to refute the

assertion of Officer Owens in his affidavit that the informant had in fact proven reliable in the past. To the contrary, the informant's reliability was substantially corroborated by the officers' further investigation, including three times when they conducted surveillance and observed what appeared to be foot traffic and hand-to-hand transactions at the Residence. United States v. Quarles, 955 F.2d 498, 501 (8th Cir. 1992)(informant's tip was reliable because he provided reliable information to officers in the past and also because the information provided by the informant was "substantially corroborated" through police officer surveillance). As such, Defendant has failed to meet his burden to show that the balance tips in favor of disclosure of the identity of the informant in support of any challenge to the warrant. United States v. Alcantar, 271 F.3d 731, 739 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002) ("'In order to override the government's privilege of nondisclosure, defendants must establish beyond mere speculation that the informant's testimony will be material to the determination of the case.'") (quoting United States v. Hollis, 245 F.3d 671, 674 (8th Cir. 2001)).

Nor is Defendant entitled to pretrial disclosure of the identity of the informant in connection with the further case proceedings. In light of the nature of the charges brought against Defendant, the informant's role is akin to a mere tipster. Defendant Ford is not charged with the drug offenses detailed in the search warrant; he is charged, in a simple one-count indictment, with possession with intent to distribute five or more grams of cocaine base based upon the narcotics seized from his residence. The government need not disclose the identity of an informant who, as here, provides information to law

enforcement officers which is used to provide probable cause for issuance of a search warrant, but who is neither a witness to nor a participant in the actual offense charged. Alcantar, 271 F.3d at 739; United States v. House, 604 F.2d 1135, 1140 (8th Cir. 1979), cert. denied, 445 U.S. 931 (1980).

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence and Request for Disclosure of the Confidential Informant [Doc. #15] be **Denied**.

The parties are advised that they have ten (10) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 28th day of December, 2005.